## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SEAN J. FLOYD, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00454-NT |
| | ) | |
| WALDO COUNTY et al., | ) | |
| | ) | |
| **Defendant** | ) | |

## RECOMMENDED DECISION AFTER PRELIMINARY REVIEW

In his pro se complaint, Sean J. Floyd brings civil rights claims against Waldo County and Waldo County Sheriff's Deputies James Greely, James Porter, Kevin Littlefield, and Darrin Moody. *See* Complaint (ECF No. 1) ¶¶ 4-8. Because I granted Floyd's application to proceed *in forma pauperis*, *see* Order (ECF No. 5), his complaint is now before me for preliminary review in accordance with 28 U.S.C. § 1915(e)(2)(B). For the reasons that follow, I recommend that the Court dismiss Floyd's complaint.

### I. Legal Standard

The federal *in forma pauperis* statute, 28 U.S.C. § 1915, is designed to ensure meaningful access to federal courts for persons unable to pay the costs of bringing an action. *See Neitzke v. Williams*, 490 U.S. 319, 324 (1989). When a party proceeds *in forma pauperis*, however, a court must "dismiss the case at any time if" it determines that the action "is frivolous or malicious[,] . . . fails to state a claim on which relief may be granted," or "seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Dismissals under section 1915 are often made on the court's own initiative "prior to the issuance of process, so as to

1

spare prospective defendants the inconvenience and expense of answering" meritless complaints. *Neitzke*, 490 U.S. at 324.

When considering whether a complaint states a claim for which relief may be granted, the court must accept the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). A complaint fails to state a claim when it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). An unrepresented plaintiff's complaint must be read liberally in this regard, *see Donovan v. Maine*, 276 F.3d 87, 94 (1st Cir. 2002), but must still contain "the crucial detail of who, what, when, where, and how" in order to provide fair notice of what the claims are and the grounds upon which they rest, *Byrne v. Maryland*, No. 1:20-cv-00036-GZS, 2020 WL 1317731, at \*5 (D. Me. Mar. 20, 2020) (rec. dec.), *aff'd*, 2020 WL 2202441 (D. Me. May 6, 2020).

## II. Allegations

In September 2018, Floyd was released on bail pending trial on felony terrorizing charges. *See* Complaint ¶ 9. Floyd's conditions of release included no contact with the alleged victims (the owners and employees of Swan Lake Grocery), warrantless searches of his property, and that he wear a location tracking ankle monitor, keep the unit adequately charged, and report to the Waldo County Sheriff's Department (WCSD) any equipment defect, damage, or malfunction. *See id.* ¶¶ 9-12.

Soon after his release, Floyd's ankle monitor started having difficulty staying charged and began triggering false exclusion zone alarms. *See id.* ¶¶ 14, 16. Deputy

Greely told Floyd that the alarm and battery issues were likely due to unreliable cellular reception and installed a landline unit at Floyd's residence so that the ankle monitor's GPS system could connect through the landline instead of the cellular network. *See id.* ¶ 17. This installation negatively impacted Floyd's ability to place or receive calls on his landline and the reliability of his internet connection. *See id.* ¶ 18. Deputy Greely made no attempt to remedy these connectivity issues when Floyd informed him of them, despite the fact that no provision of the ankle monitoring contract required him to consent to a landline unit. *See id.* ¶¶ 18-19.

On January 5, 2019, Floyd called the WCSD to ask about protesting the WCSD and the District Attorney's (DA's) Office, considering they were the ones barring his protests against Swan Lake Grocery. *See id.* ¶ 24. Floyd spoke with Deputy Porter, who told him that he could protest the WCSD and the DA's Office if he remained civil, but that any obscenities or defamatory remarks would be considered disorderly conduct. *See id.* ¶ 25. When Floyd pushed back, Deputy Porter told him that he could file a formal complaint with the Attorney General's office. *See id.* ¶¶ 25-27. Floyd installed lawn signs, which were devoid of obscenities or defamatory remarks, protesting the WCSD and the DA a few days later. *See id.* ¶ 29.

Meanwhile, Floyd's issues with his ankle monitor worsened. *See id.* ¶ 30. On January 12, 2019, Floyd's ankle monitor triggered an exclusion zone alarm and when he called the WCSD to report it, reiterating the battery issue, Deputy Greely suggested that he try leaving the unit plugged in overnight to charge. *See id.* ¶ 31. Floyd later learned from a Corrections Officer at Waldo County Jail that the ankle

3

monitor's operating manual expressly warns against wearing the charging unit overnight because the battery can overcharge and "explode into a fireball." *Id.* ¶ 32.

Floyd's ankle monitor triggered the exclusion zone alarm twice more in January due to a loose wire in its charging unit. *See id.* ¶¶ 34-35, 39. Deputy Moody responded to the first false alarm and told Floyd that he would sign out a new charging unit for him within the next week or so. *See id.* ¶¶ 35-36. Deputies Porter and Littlefield responded to the second false alarm. *See id.* ¶¶ 39-40. While Deputy Littlefield inspected Floyd's ankle monitoring equipment, Deputy Porter searched through his medications and other belongings. *See id.* ¶¶ 41-42. Deputy Littlefield then asked Floyd whether he had marijuana in the house, to which Floyd responded that he did but that his bail conditions permitted medical marijuana and he had the court documents and medical marijuana card to prove it. *See id.* ¶ 43. Deputy Littlefield nonetheless handcuffed Floyd and placed him under arrest for violating his release conditions. *See id.* ¶ 44. Floyd asked to be released after Deputy Littlefield examined the relevant documents, but Deputy Littlefield only reiterated that it was Floyd's responsibility to ensure that his ankle monitor was operational, regardless of his earlier conversation with Deputy Moody about replacing its charging unit. *See id.* ¶ 46. Deputy Littlefield's arrest report stated that Floyd had violated the conditions of his release by possessing marijuana and that while the ankle monitoring equipment malfunctioning could indicate a charging error, it was ultimately Floyd's responsibility to ensure that it was in working order. *See id.* ¶ 49.

Floyd was then charged and tried for violating the condition of his release that

he "comply with electronic monitoring administered by the [WCSD]." *Id.* ¶ 53. At trial, Deputy Moody testified as a witness for the prosecution and failed to disclose anything about his discussions with Floyd regarding the charging unit's loose wire or that he had signed out a new charging unit for Floyd but never delivered it. *See id.* ¶¶ 54-55. Ultimately, Floyd was found not guilty of the charge. *See id.* ¶ 57.

### III. Discussion

In his complaint, Floyd brings 42 U.S.C. § 1983 claims against the deputy sheriffs in their individual capacities for violations of his First, Fourth, Fifth, and Fourteenth Amendment rights under the U.S. Constitution, and against Waldo County on the basis that it was the proximate cause of these constitutional violations due to its failure to train and/or its policies or customs. *See id.* ¶¶ 59-71; *Barreto-Rivera v. Medina-Vargas, et al.*, 168 F.3d 42, 45 (1st Cir. 1999) ("To state a claim under section 1983, a plaintiff must allege two elements: [(1)] that the conduct complained of has been committed under color of state law, and [(2)] that this conduct worked a denial of rights secured by the Constitution or laws of the United States.").

As was true in Floyd's prior actions, his claims against the individual officers are subject to dismissal for failure to state a claim. To begin with, Floyd alleges that Defendant Porter violated his First Amendment right to free speech because, when he called to inquire about protesting the WCSD and the DA's Office, Defendant Porter advised that he would run afoul of disorderly conduct law if he used defamatory or obscene language on his lawn signs, which Floyd interpreted to mean that he would be "arrested for defamation" if he used such language. *See* Complaint ¶¶ 24-28, 63.

A few days later, Floyd installed signs on his lawn that did not use any language that was offensive or "could reasonably constitute defamation . . . ." *Id.* ¶ 29. Critically, however, Floyd neglects to cogently allege that his speech was in fact chilled as a result of his conversation with Defendant Porter because he does not allege that he changed the speech on his signs at all, much less that he did so in response to their interaction. Absent these essential facts, even a liberal construction of Floyd's complaint cannot support a First Amendment claim. *See Sullivan v. Carrick*, 888 F.2d 1, 4 (1st Cir. 1989) ("Where a chilling effect is speculative, indirect, or too remote, finding an abridgment of First Amendment rights is unfounded."); *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979) ("Our duty to be less stringent with pro se complaints does not require us to conjure up unpled allegations." (cleaned up)).

Floyd's claim that Defendants Porter and Littlefield violated his Fourth Amendment right by arresting him for violating his conditions of release without probable cause likewise fails. *See* Complaint ¶ 64. "[P]robable cause need only exist as to *any* crime that *could have been* charged under the circumstances." *LaFrenier v. Kinirey*, 478 F. Supp. 2d 126, 137 (D. Mass. 2007). In this case, even if I accept Floyd's allegation that the officers lacked probable cause to arrest him for violating his conditions of release by possessing marijuana, probable cause existed to do so based on his failure to comply with the electronic ankle monitoring program. *See* Complaint ¶¶ 39-51. Floyd's alleged technical difficulties with his ankle monitor did not alter his obligation to maintain it pursuant to his bail conditions. *See id.* ¶¶ 9-16, 30, 34-41; *see also Clapp v. Fanning*, No. 18-cv-10426-ADB,

6

2022 WL 827404, *9 (D. Mass. Mar. 18, 2022) (rejecting the argument that an acquittal calls into question whether probable cause supported the original arrest).

The remaining claims against the individual officers also fall short because Floyd fails to allege facts sufficient to support a section 1983 claim, even with a liberal reading of his complaint. *See Twombly*, 550 U.S. at 570 (holding that complaints that fail to cross "the line from conceivable to plausible . . . must be dismissed").

Floyd's claims against Waldo County fare no better because his complaint fails to cogently allege that his constitutional rights were violated because of a municipal policy or custom and instead offers only bare legal conclusions. *See Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (noting that conclusory "the-defendant-unlawfully-harmed-me" allegations "should not be given credence when standing alone"); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as entity is responsible under § 1983.").

Finally, this is the fourth case that Floyd has filed in this Court alleging claims that stem from his protests of Swan Lake Grocery. His two earlier actions were dismissed for failure to state a claim, *see Floyd v. Waldo Cnty. Sheriff's Dep't*, Nos. 1:23-cv-00378-NT, 1:23-cv-00379-NT, 2024 WL 2110265, at *1-4 (D. Me. May 10, 2024) (rec. dec.), *aff'd*, 2024 WL 2924213 (June 10, 2024) (consolidated decision in the two cases), and his most recent suit was dismissed as barred by the doctrine of res judicata and for failure to state a claim, *see Floyd v.*

*Waldo Cnty.*, No. 1:24-cv-00242-NT, 2025 WL 692930, at \*1 (D. Me. Mar. 4, 2025) (rec. dec.), *aff'd*, 2025 WL 987692 (Apr. 2, 2025).  Therefore, Floyd should be warned—given the duplicative nature of his complaints and his failure to meaningfully engage with the reasoning of the Court's prior decisions—that further groundless filings may result in filing restrictions that limit his ability to initiate new cases in this District. *See Cok v. Fam. Ct. of R.I.*, 985 F.2d 32, 35 (1st Cir. 1993) (noting that courts may impose filing restriction on serial litigants after adequate notice).

## IV.  Conclusion

For the foregoing reasons, I recommend that the Court **DISMISS** Floyd's complaint pursuant to 28 U.S.C. § 1915(e)(2)(B).  Furthermore, I recommend that the Court **WARN** Floyd that further groundless filings may result in the imposition of filing restrictions against him in this District.  *See Cok*, 985 F.2d at 35.

### *NOTICE*

*A party may file objections to those specified portions of a Magistrate Judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the District Court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the District Court and to appeal the District Court's order.*

Dated: April 7, 2025

/s/ Karen Frink Wolf
United States Magistrate Judge

8